BREAUX, C. J.
This is a suit for a judgment to have a marriage decreed null. This marriage was entered into between plaintiff and defendant before a justice of the peace in the very early morning of the 29th day of September, 1908.
The ground on which plaintiff bases his suit is that he was forced to marry the defendant.
Brief Statement of the Pleading.
The complaint is that he was forced by the father of defendant and by two of his male relatives and a friend.
Plaintiff’s complaint further is that at 2 *279 o’clock in tlie morning a license was obtained from the clerk of court, and immediately a justice of the peace was sent for and the marriage ceremony performed.
lie alleged in his petition that he resisted the demand made of him to marry the,defendant until he began to see danger to himself if he continued in refusing to marry the defendant; that, while apprehending that he would be murdered if he did not accede to the marriage, he went through the ceremony of marrying the defendant.
1-Ie avers, in substance, that he had never paid attention to defendant as a suitor to her hand, never asked her in marriage, never was engaged to her, and was under iio moral obligation to become defendant’s husband.
That after the marriage ceremony, still under fear of those who forced him to repair to Franklin and who accompanied him, and under fear of others who remained away, he went to the home of defendant.
That on recovering his liberty he repudiated the marriage and refused to live with the defendant and never ratified or confirmed the marriage.
The defendant avers, in effect, that it is not true that plaintiff was placed in fear and forced to marry her.
In the alternative, her position is, as a defendant, that, if the court should find that plaintiff was treated as he alleged, he had ratified and confirmed the marriage after he had recovered his liberty and voluntarily lived with her.
Statement of the Case.
Both plaintiff and defendant were residents of the town of Patterson on the Teche.
The plaintiff had made remarks about the defendant and connected therewith the name of a young man who resided in Morgan City. This young man, hearing of these remarks, went to Patterson and informed the father of the defendant of these remarks.
lie became one of the party bent on compelling the plaintiff to marry the defendant. During the quarrel in the early morning, which resulted in a fight, this informant from Morgan City was heard to say several times:
“He must marry her.”
This young man, who is referred to in the testimony as a professional baseball player, and plaintiff quarreled and fell to fighting with their fists.
This was on the street in the early evening, the evening preceding the morning of the marriage, to which we have above referred. 1-Iow the fight ended the evidence does not state.
A moment afterwards, plaintiff went into the store of one of the merchants, and while in the store he met the angry father of the defendant.
They began to fight. The owner of the store seriously objected to such a disturbance of the peace in his place of business. He put a stop to it and said to these disturbers of the peace, that, if they wished to talk over the matter, they might go to an adjoining room, to which he pointed.
This suggestion was accepted by plaintiff and the defendant’s father, and the two walked into the room and talked over the matter some little time. No one heard what was said between them.
They all were armed; that is, the plaintiff and the relatives and friend of the defendant in the vernacular were “heeled.”
When the two, the plaintiff and the father of defendant, walked into the adjoining room, two of defendant’s party took down buggy -whips that were hanging on one of the walls of the store.
Plaintiff, on leaving the room and returning into the store, said that he would marry the defendant.
Immediately there were preparations made to go to Franklin in order to obtain the re *281 quired license and to have the marriage ceremony performed.
Plaintiff’s clothes were damaged in the scuffle. 1-Iis hat could not be found. There was nothing strange in its disappearance, for in an affray, we fancy, that the most active may well lose his hat. Plaintiff refused to go further without his hat.
He must have' found a hat, and he was given an opportunity to put on other clothing.
Two of defendant’s party accompanied plaintiff to his room, where he changed his clothing, and shortly thereafter all left for the parish seat.
After the struggle referred to above, there must have been some talk among the parties about the marriage.
Opinion and Judgment.
Up to date improvements lend themselves to hurried marriages.
The father of the defendant telephoned IS miles away, late in the night — it must have been near 12 o’clock — and asked the clerk of court whether he would issue a license to plaintiff to marry his daughter.
The clerk’s reply was that the hour to issue the license was unusual. Nevertheless, he issued a license. At first the clerk positively refused to issue the license.
The father asked the clerk to grant'him an interview on his arrival in Eranklin, a request that could scarcely be denied, as every ■ one has a right to be heard.
The request was acceded to by the clerk with the result that after the parties arrived It was finally concluded that it was advis-sable to let them be married. There was apparent good humor among the party; everything appeared smooth to the clerk.
The defendant and her group were artful enough (if it was done designedly) not to let-it be known that there had been a slight affray. The little allusion made to it was in a playful mood, and the plaintiff’s conduct or utterances were not such as to give rise to a suspicion in that regard. The plaintiff urged not the least objection. On the contrary, he openly expressed willingness to go through the ceremony and was married by the officiating justice of the peace, and, as the latter testified, also the clerk, without the plaintiff making the least impression of unwillingness on his part.
AVe reiterate, during all this time there was good humor among all of the parties, including the plaintiff. Not once did plaintiff give out the most remote intimation that he had been the victim of threats or violence. The clerk and the justice of the peace testified and stated that they were entirely satisfied from the appearance of the parties and the talk with them,'including the plaintiff, that there were no threats brought to bear.
After the marriage, at the depot, awaiting the cars to' return to Patterson, the plaintiff, doubtless, tired after the day’s activity, leaned on defendant’s shoulder and went to sleep apparently.
After the return to Patterson of plaintiff and defendant and those who went with them plaintiff and defendant went to the house of defendant’s father. Nothing unusual happened. The father of defendant and her brother went early to their work in the sawmill shops near by.
The plaintiff and defendant lived together as man and wife and all that those words imply from the morning of their return from Franklin until the next day.
The evidence does not show that plaintiff was shadowed after his return and while at the house.
When the night came — the first night after the marriage — the father of the defendant returned to his home. Plaintiff asked him to go with him to the town. The father declined and said that his son would go with him. He did go.
One witness testified that while thus going *283 with plaintiff he appeared to shadow him. He had his hand on his rear pocket.
From the testimony it does not appear that plaintiff in the least protested against the action of the son.
We do not infer that the plaintiff is a weakling. He certainly — if anything of the kind was done — could at least have remonstrated. But this is not the only time that some remonstrance would have been in place. On coming from the room into the store on the night in question, instead of complaining, he was heard to say that he would marry the defendant.
He went to his room at the hotel, dressed himself for the wedding, and never raised the least objection.
Others, who were not in sympathy with the defendant and her party, saw him. It does not appear that he uttered the least protest. He left from the home of defendant; he returned to it after the marriage without complaining.
On the morning of the second day he said to defendant that he was going to Morgan City. Not a word of objection was raised by defendant or any of the family. He left as one enjoying full liberty.
But before leaving he kissed defendant and her female relatives present, including defendant’s mother. He parted apparently on good terms with them all. When asked as to his return, his answer was that he had another trouble before him in Morgan City.
He was at the time engaged to be married to a young lady in Morgan City. This, we take it, was the trouble he expected to meet.
In two or three days he returned to his newspaper office in Patterson.
Called upon by defendant at his office, she, without much talk, shot him with a pistol owned by her cousin, who was one of the party who followed plaintiff and defendant to Franklin. This was outrageously wrong, but it presents a different issue. It cannot be taken as obliterating that which had been done.
We cannot give the least sanction to the conduct of those who, on the part of the defendant, brought on the difficulty in the-early part of the night in Patterson.
To say the least, it was anything but. right to treat him as he was treated.
They showed him not the least consideration. That is not the way to build up family ties.
If the case had ended with the trouble at the store in the early part of the night, the result would be different. We cannot give our sanction to any such conduct. But it did not end there.
But the plaintiff made no attempt to stand upon his rights. He married without objection, in so far as the evidence discloses.
Violence may be condoned if the married person has freely and without constraint cohabited together after recovering his liberty. Civ. Code, art. 111.
I-Ie began to express his willingness to-marry the defendant in a loud and audible voice, which was heard by witnesses who are-not discredited in any way. Never for a moment did he attempt to recall this consent. 1-Ie satisfied the clerk and the justice of the-peace of his willingness to marry the defendant.
The plaintiff is intelligent, active, and amply able to take care of himself. Why this dilatoriness in expressing his intention to repudiate the marriage after what had' taken place? There were no threats proven, and it was not under impending threat that the plaintiff and defendant lived at the home-of defendant’s father. We take it, he was free to leave, as he left in the morning and; repaired to Morgan City.
If plaintiff was under the power of the-father and others, there is no evidence that that power was held over him after the marriage.
*285 As relates to contract, to which we refer because the rale has been held as applying to the contract of marriage, it cannot be invalidated on an allegation of violence or threats if it has been approved. Civ. Code, art. 1855.
There is here every evidence of complete approval.
The testimony shows that defendant’s life was not what it should have been.
If the evidence be true, she was sadly unfortunate in her conduct. It was deplorable and a shame in a community in which social order prevails.
Conceding for a moment all that the evidence shows in this respect, she, none the less, had certain rights. Ratification in so far as she was concerned was possible.
There was ratification, as we think the evidence shows. She had the right not to be imposed upon in the name of marriage.
It devolved upon the plaintiff if he was compelled to marry her, when it came to the consummation of the marriage, to declare that under no circumstances he would go to the end with the matter. He was married, ’tis true; the proper ceremony had been followed ; the evidence does not prove that he was forced to go one step further.
It is, therefore, ordered, adjudged, and decreed that the judgment appealed from is avoided, annulled, and reversed.
It is further ordered, adjudged, and decreed that plaintiff’s suit be dismissed, and the demand rejected at costs of plaintiff in both courts.